# United States Court of Appeals
## For the First Circuit

No. 21-1068

ROBERT FRESE,

Plaintiff, Appellant,

v.

JOHN M. FORMELLA, in his official capacity as Attorney General
of the State of New Hampshire,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Joseph N. Laplante, U.S. District Judge]

Before

Kayatta, Howard, and Thompson, Circuit Judges.

Brian Hauss, with whom Emerson Sykes, American Civil
Liberties Union Foundation; Gilles Bissonnette and Henry R.
Klementowicz, American Civil Liberties Union of New Hampshire;
John M. Greabe; Lawrence A. Vogelman and Shaheen & Gordon, P.A.
were on brief, for appellant.
Samuel R.V. Garland, Assistant Attorney General, with whom
John M. Formella, Attorney General of New Hampshire, and Anthony
J. Galdieri, Senior Assistant Attorney General, were on brief, for
appellee.

November 8, 2022

HOWARD, **Circuit Judge**. New Hampshire is among a handful of states that allow criminal prosecution of defamation. Appellant Robert Frese has twice been charged with violating the criminal defamation statute and now argues that the statute itself contravenes the First and Fourteenth Amendments. Mindful of the Supreme Court's guidance that "the knowingly false statement and the false statement made with reckless disregard of the truth, do not enjoy constitutional protection[,]" we conclude that Frese's allegations fall short of asserting viable constitutional claims. Garrison v. Louisiana, 379 U.S. 64, 75 (1964). We thus affirm the district court's dismissal.

## I.

New Hampshire's criminal defamation statute provides that "[a] person is guilty of a class B misdemeanor if he purposely communicates to any person, orally or in writing, any information which he knows to be false and knows will tend to expose any other living person to public hatred, contempt or ridicule." N.H. Rev. Stat. § 644:11(I). "'[P]ublic' includes any professional or social group of which the victim of the defamation is a member." Id. at § 11(II). A person convicted of a class B misdemeanor faces a fine of up to $1,200. N.H. Rev. Stat. § 651:2(IV)(a). Because such charges carry no possibility of jail time, criminal defamation defendants have no right to trial by jury and are not afforded

- 2 -

court-appointed counsel.  See State v. Whitney, 172 N.H. 380, 382 (2019); State v. Foote, 149 N.H. 323, 324 (2003); State v. Westover, 140 N.H. 375, 377-78 (1995).

New Hampshire's misdemeanor enforcement process empowers police departments to prosecute defamation.  In the absence of the exercise of discretionary supervisory authority by the state Attorney General or County Attorneys, municipal police departments may initiate prosecutions for misdemeanors, including criminal defamation, without prior input or approval from such prosecutors. See State v. La Palme, 104 N.H. 97, 98-99 (1962) ("The prosecution of misdemeanors by police officers is a practice that has continued in one form or another since 1791 and is still permissible under existing statutes." (citing State v. Urban, 98 N.H. 346 (1953))); see also N.H. Rev. Stat. § 41:10-a (recognizing the power of police officers to prosecute misdemeanors).  Private citizens may also prosecute misdemeanors in New Hampshire, so long as incarceration is not an applicable penalty.  See State v. Martineau, 148 N.H. 259, 261, 263 (2002).[1]

Although criminal defamation is rarely prosecuted in New Hampshire, Frese has twice been charged under section 644:11.  In

---

[1] Notably, any private citizen who commences one of these actions could be held liable for malicious prosecution if that person acted without probable cause; likewise, a police officer could be liable if the officer acted wantonly.  Farrelly v. City of Concord, 168 N.H. 430, 440 (2015); State v. Rollins, 129 N.H. 684, 687 (1987) (Souter, J.).

2012, the Hudson Police Department arrested Frese for comments about a local life coach that he posted on a Craigslist website. Frese called the coach's business a scam and accused him of, among other things, being involved in a road rage incident and distributing heroin. Without the advice of counsel, Frese pleaded guilty and was fined $1,488, of which $1,116 was conditionally suspended. Six years later, the Exeter Police Department arrested Frese for comments he had pseudonymously posted in the online comments section of a newspaper article about a retiring Exeter police officer. The comments included statements that the retiring officer was "the dirtiest[,] most corrupt cop [Frese] ha[d] ever had the displeasure of knowing" and that the officer's daughter was a prostitute.

Frese's second arrest generated public controversy. In response, the New Hampshire Attorney General interposed and concluded that the police department had arrested Frese without probable cause because there was no evidence that Frese knew his statements were false. The Exeter Police Department subsequently dropped the charges.

In late 2018, maintaining that he feared future arrest, Frese filed a complaint in federal district court asserting that section 644:11 is so vague as to violate the Fourteenth Amendment. After initial skirmishing, Frese filed an amended two-count complaint, which is the operative complaint before us. As before,

the first count charges that section 644:11 "is unconstitutionally vague, both on its face and as applied in the context of New Hampshire's system for prosecuting [c]lass B misdemeanors," in violation of the Fourteenth Amendment. The second count asserts that the statute "violates the First Amendment because it criminalizes defamatory speech." The State moved to dismiss the amended complaint, and the district court obliged. After first finding that Frese had established standing to bring the case, the court dismissed for failure to state a claim, pursuant to Federal Rule of Civil Procedure 12(b)(6).[2] Frese's timely appeal followed.

**II.**

We review the district court's dismissal of the complaint under Rule 12(b)(6) de novo. See Barchock v. CVS Health Corp., 886 F.3d 43, 48 (1st Cir. 2018) (citing SEC v. Tambone, 597 F.3d 436, 441 (1st Cir. 2010) (en banc)). "We take the complaint's well-pleaded facts as true, and we draw all reasonable inferences in [Frese's] favor." Id. Well-pleaded facts are those that are "'non-conclusory' and 'non-speculative.'" Id. (quoting Schatz v.

---

[2] The parties do not challenge the finding of standing, and we see no error in the district court's standing analysis. See Dantzler, Inc. v. Empresas Berríos Inventory and Operations, Inc., 958 F.3d 38, 46 (1st Cir. 2020) ("'[B]ecause standing is a prerequisite to a federal court's subject matter jurisdiction' . . . we must 'assure ourselves of our jurisdiction under the federal Constitution' before we proceed to the merits of a case." (first quoting Hochendoner v. Genzyme Corp., 823 F.3d 724, 730 (1st Cir. 2016), then quoting Pérez-Kudzma v. United States, 940 F.3d 142, 144 (1st Cir. 2019))).

Republican State Leadership Comm., 669 F.3d 50, 55 (1st Cir. 2012)). To survive dismissal, "the complaint must 'contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" Id. (quoting Tambone, 597 F.3d at 437).

**A.    First Amendment Claim**

Frese argues that section 644:11 violates the First Amendment because criminal defamation laws should be per se unconstitutional. The Supreme Court, however, has upheld the criminalizing of false speech, explaining that deliberate and recklessly false speech "do[es] not enjoy constitutional protection." Garrison, 379 U.S. at 75. Thus, the state can "impose criminal sanctions for criticism of the official conduct of public officials" so long as the statements were made with "'actual malice' -- that is, with knowledge that [they were] false or with reckless disregard of whether [they were] false or not." Id. at 67 (quoting New York Times Co. v. Sullivan, 376 U.S. 254, 279-80 (1964)); see also Mangual v. Rotger-Sabat, 317 F.3d 45, 66 (1st Cir. 2003).

Frese concedes that Garrison forecloses his First Amendment claim but argues that "[t]he time has come to revisit that decision." But, as Frese acknowledges, we do not have the power to revisit Supreme Court decisions. See Hohn v. United States, 524 U.S. 236, 252-53 (1998); United States v. Morosco, 822

F.3d 1, 7 (1st Cir. 2016) ("[B]ecause overruling Supreme Court precedent is the Court's job, not ours, we must follow [prior decisions] until the Court specifically tells us not to . . . even if these long-on-the-books cases are in tension with [newer cases]."). Accordingly, we must find that Garrison precludes Frese's First Amendment attack on section 644:11.

B.     Fourteenth Amendment Vagueness

"The vagueness doctrine, a derivative of due process, protects against the ills of laws whose 'prohibitions are not clearly defined.'" Nat'l Org. for Marriage v. McKee, 649 F.3d 34, 62 (1st Cir. 2011), abrogated on other grounds by Ams. for Prosperity Found. v. Bonta, 141 S. Ct. 2373 (2021) (quoting Grayned v. City of Rockford, 408 U.S. 104, 108 (1972)). A statute is impermissibly vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." United States v. Williams, 553 U.S. 285, 304 (2008) (citing Hill v. Colorado, 530 U.S. 703, 732 (2000)); see also Johnson v. United States, 576 U.S. 591, 595 (2015). This creates two avenues by which to attack a vague statute: discriminatory enforcement and lack of notice.

To prevent the chilling of constitutionally protected speech, we apply a "heightened standard" in cases involving the First Amendment and "require[] a 'greater degree of specificity'"

in a statute that restricts speech. McKee, 649 F.3d at 62 (quoting Buckley v. Valeo, 424 U.S. 1, 77 (1976)). Additionally, "if criminal penalties may be imposed for violations of a law, a stricter standard is applied in reviewing the statute for vagueness." Manning v. Caldwell for City of Roanoke, 930 F.3d 264, 272-73 (4th Cir. 2019) (citing Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc., 455 U.S. 489, 498-99 (1982)). "But 'perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity.'" Williams, 553 U.S. at 304 (quoting Ward v. Rock Against Racism, 491 U.S. 781, 794 (1989)); see also McKee, 649 F.3d at 62.

Frese mounts a facial challenge to section 644:11, as well as a "hybrid" challenge. We first consider his facial challenge. To succeed, Frese must "establish that no set of circumstances exists under which the [statute] would be valid." Dutil v. Murphy, 550 F.3d 154, 160 (1st Cir. 2008) (quoting United States v. Salerno, 481 U.S. 739, 745 (1987)). We are mindful that facial challenges "are disfavored" because they "often rest on speculation," "run contrary to the fundamental principle of judicial restraint," and "threaten to short circuit the democratic process." Hightower v. City of Boston, 693 F.3d 61, 76-77 (1st Cir. 2012) (quoting Wash. State Grange v. Wash. State Republican Party, 552 U.S. 442, 450 (2008)).

- 8 -

Frese argues that section 644:11 is unconstitutionally vague under both lack of notice and discriminatory enforcement theories, training most of his attention on discriminatory enforcement. We turn to that claim first.

### 1. Discriminatory Enforcement

A "statute authorizes an impermissible degree of enforcement discretion -- and is therefore void for vagueness -- where it fails to 'set reasonably clear guidelines for law enforcement officials and triers of fact in order to prevent arbitrary and discriminatory enforcement.'" Act Now to Stop War & End Racism Coal. v. District of Columbia, 846 F.3d 391, 410-11 (D.C. Cir. 2017) (quoting Smith v. Goguen, 415 U.S. 566, 573 (1974)); see also Kolender v. Lawson, 461 U.S. 352, 358 (1983) (explaining that the most "important aspect of vagueness doctrine" is "the requirement that a legislature establish minimal guidelines to govern law enforcement" (internal citation omitted)).

We conclude that the statute at issue here provides adequate guidelines for law enforcement, and therefore passes constitutional muster. Frese argues that the statute is unconstitutionally vague, because different persons may have "different standards for determining what is and is not defamatory." But the statute provides reasonably clear guidance -- defamatory statements are those false statements that "expos[e]

- 9 -

any . . . person to public hatred, contempt or ridicule." Likewise, we doubt that reasonable persons will have much difficulty in ascertaining objectively whether a false statement exposes the victim to public hatred, contempt, or ridicule, even if the public is defined to include professional and social groups to which the victim belongs. Frese offers no hypothetical example of how a factfinder might struggle unduly to determine whether a given set of facts demonstrates the requisite tendency of the false remarks. Indeed, for centuries factfinders have made such determinations. E.g., Richardson v. Thorpe, 73 N.H. 532, 534 (1906) (collecting cases for the proposition that whether an ambiguous phrase was defamatory is a question for the jury).

The parties also agree that section 644:11 adopts part of New Hampshire's common law defamation standard. Under the common law, "[w]ords may be found to be defamatory if they hold the plaintiff up to contempt, hatred, scorn or ridicule, or tend to impair [the plaintiff's] standing in the community." Boyle v. Dwyer, 172 N.H. 548, 554 (2019) (second alteration in original) (quoting Thomas v. Tel. Publ'g Co., 155 N.H. 314, 338 (2007)). The incorporation of common law standards provides further guidance to law enforcement about the meaning of the statute, not least because the definition of defamation under New Hampshire common law has remained relatively consistent for over one hundred years, and has been regularly analyzed by courts and applied by

juries.  Compare Richardson, 73 N.H. 532 at 534 ("Any written words which directly or indirectly charge a person with a crime, or which tend to injure his reputation in any other way, or to expose him to public hatred, contempt, or ridicule, are defamatory."), with Boyle, 172 N.H. at 554 ("Words may be found to be defamatory if they hold the plaintiff up to contempt, hatred, scorn or ridicule, or tend to impair [the plaintiff's] standing in the community." (alteration in original) (quoting Thomas, 155 N.H. at 338)).

Additionally, common law defamation in New Hampshire is subject to objective measurement, which further protects against arbitrary enforcement.  Under New Hampshire common law, liability may be imposed only if "the defamatory meaning . . . [is] one that could be ascribed to the words by persons of common and reasonable understanding."  Id. (quoting Thomson v. Cash, 119 N.H. 371, 373 (1979)).

Nevertheless, Frese contends that "the common law of civil defamation is not stable or precise enough to define a criminal restriction on speech."  Frese cites three cases to support this contention.  But in each of these cases the laws found to be unconstitutionally vague were significantly broader than section 644:11 and did not contain a requirement that the speaker know the statement to be false.  See Ashton v. Kentucky, 384 U.S. 195, 198 (1966) (trial court defined criminal libel as "any writing calculated to create disturbances of the peace, corrupt the public

- 11 -

morals, or lead to any act, which, when done, is indictable");[3] Tollett v. United States, 485 F.2d 1087, 1088 n.1 (8th Cir. 1973) (statute prohibited mailing post cards containing "language of libelous, scurrilous, defamatory, or threatening character, or [language] calculated by the terms or manner or style of display and obviously intended to reflect injuriously upon the character or conduct of another"); Gottschalk v. State, 575 P.2d 289, 290 n.1 (Alaska 1978) (statute proscribed "publish[ing] defamatory or scandalous matter concerning another with intent to injure or defame him").[4]

Thus, none of Frese's cited cases involved a statute on all fours with the one here, and Frese offers us no reason to discount this distinction. And at least one federal district court

---

[3] It is worth noting that in Ashton, the Supreme Court implied in its analysis that a criminal defamation law that prohibited "the publication of a defamatory statement about another which is false, with malice" would not be unconstitutionally vague. See Ashton, 384 U.S. at 198; How v. City of Baxter Springs, 369 F. Supp. 2d 1300, 1305-06 (D. Kan. 2005).

[4] The statute in Gottschalk did not define "defamatory or scandalous." Gottschalk, 575 P.2d at 292. The court determined that therefore, "the common law definition must be relied on." Id. The common law considered "any statement which would tend to disgrace or degrade another, to hold him up to public hatred, contempt or ridicule, or to cause him to be shunned or avoided was considered defamatory." Id. The court in Gottschalk apparently found that this common law definition was impermissibly vague, though at times the court seemed to gesture towards the language of the statute itself as the root of the vagueness problem. Id. at 293 (explaining that the language of the statute -- prohibiting "defamatory" or "scandalous" speech -- is vague).

has denied a vagueness challenge to a criminal defamation statute broader than section 644:11. See How, 369 F. Supp. 2d at 1304 (finding statute that criminalized "communicating to a person orally, in writing, or by any other means, information, knowing the information to be false and with actual malice, tending to expose another living person to public hatred, contempt or ridicule; tending to deprive such person of the benefits of public confidence and social acceptance" was not unconstitutionally vague).

Section 644:11 also provides significantly more guidance than statutes that have been determined unconstitutionally vague. In Kolender, the Supreme Court concluded that a California statute targeting loitering was unconstitutional. The law required a suspect stopped by police to provide "reliable" identification and to account for his presence. Kolender, 461 U.S. at 353. When asked to give "examples of how suspects would satisfy the [statute's] requirement[s]," counsel explained that "a jogger, who was not carrying identification, could, depending on the particular officer, be required to answer a series of questions concerning the route that he followed to arrive at the place where the officers detained him or could satisfy the identification requirement simply by reciting his name and address." Id. at 360 (internal citations omitted).

The Supreme Court determined that this statute afforded "full discretion" to police "to determine whether the suspect has provided a 'credible and reliable' identification," id., and therefore impermissibly "entrust[ed] lawmaking to the moment-to-moment judgment of the policeman on his beat," id. (quoting Smith, 415 U.S. at 575). Other laws or regulations found by courts to be unconstitutionally vague include statutes that contain no standard at all about when officials can exercise their discretion, as well as regulations prohibiting any "appearance" that is "objectionable." Act Now, 846 F.3d at 411 (citing Niemotko v. Maryland, 340 U.S. 268, 271-72 (1951), then quoting Armstrong v. D.C. Pub. Library, 154 F. Supp. 2d 67, 81-82 (D.D.C. 2001)); see also Williams, 553 U.S. at 306 (explaining that statutes that proscribe "annoying" behavior are vague, as they involve "wholly subjective judgments"). The statute here is a far cry from the blank checks to law enforcement that were found unconstitutional in these cases.

Nor is the statute vague because it requires some exercise of law enforcement judgment -- indeed, "enforcement [inevitably] requires the exercise of some degree of police judgment," and the question thus becomes whether "the degree of judgment involved . . . is acceptable." Hill, 530 U.S. at 733 (quoting Grayned, 408 U.S. at 114). The language of section 644:11 is sufficient, as it gives reasonably specific guidance to law

- 14 -

enforcement. Likewise, "[w]hat renders a statute vague . . . is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is." Act Now, 846 F.3d at 411 (quoting Williams, 553 U.S. at 306). At most, Frese contends that, in any given case, it might be debatable whether it has been established that a statement in fact "tend[s] to expose . . . another . . . to hatred [or] contempt." His challenge fails accordingly.[5]

## 2. Lack of Notice

A statute is impermissibly vague for lack of notice "only if it 'prohibits . . . an act in terms so uncertain that persons of average intelligence would have no choice but to guess at its meaning and modes of application.'" McKee, 649 F.3d at 62 (quoting United States v. Councilman, 418 F.3d 67, 84 (1st Cir. 2005) (en banc)).[6] We conclude that the statute provides sufficiently clear

---

[5] Frese argues that the statute must be considered in light of extrinsic evidence of New Hampshire's enforcement scheme. However, we need not address this issue, because we determine that the core statutory text of the criminal defamation statute provides adequate enforcement guidelines and the prosecution scheme does not alter or overcome this conclusion. We therefore need not address precisely what extrinsic context a court may consider in a vagueness analysis.

[6] The district court collapsed its discussion of lack of notice into its consideration of Frese's excessive discretion claim. As Frese points out, however, the district court's "analysis of [his] arbitrary enforcement challenge focused largely on notice issues."

notice. For the reasons described above, the language clearly defines and delimits its scope, such that it gives a person of "ordinary intelligence a reasonable opportunity to understand what conduct it prohibits." Hill, 530 U.S. at 732.

In Hill, the Supreme Court confronted a challenge to a Colorado statute that that prohibited "knowingly approach[ing]" a person to "engag[e] in oral protest, education, or counseling with [that] person." Id. at 707. The Court concluded that the statute provided adequate notice. Specifically, it reasoned, while there might be some hypothetical cases where there would be a "nice question" about the "meaning of these terms," courts cannot require statutes to use language with "mathematical certainty." Id. at 732-33 (quoting Am. Commc'ns Assn. v. Douds, 339 U.S. 382, 412 (1950), then Grayned, 408 U.S. at 110). As with the Colorado statute considered in Hill, section 644:11 may beget cases where there are questions about whether the conduct at issue falls within the language of the statute. However, this alone does not create a notice problem, given that "it is clear what the [statute] as a whole prohibits." Hill, 530 U.S. at 733 (quoting Grayned, 408 U.S. at 110); see also Henderson v. McMurray, 987 F.3d 997, 1004 (11th Cir. 2021).

Refining his notice argument, Frese takes issue with section 644:11's definition of "public" to include "any professional or social group," which Frese claims does not consider

- 16 -

"how small the group or how peculiar its views." Frese argues that the statute cannot provide adequate notice because "[d]ifferent professional and social groups will often have different, sometimes conflicting, standards for what constitutes defamation." The statute, Frese argues, "incorporates each of these" potentially disparate "standards as a yardstick for criminal conviction," and as such, makes it difficult for any person to determine what conduct the statute prohibits.[7]

We are not convinced. First, the incorporation of the common law provides safeguards against imposing criminal liability for speech that offends the views of particularly niche or idiosyncratic groups, which in turn shields against any notice problems. As discussed previously, the common law objectivity standard requires that "the defamatory meaning . . . [is] one that could be ascribed to the words by persons of common and reasonable understanding." Boyle, 172 N.H. at 554. And section 644:11(I)'s knowledge requirement creates additional protection.[8]

---

[7] Frese also asserts that "this is a constitutionally significant departure from the common law," which imposes civil liability for defamation only when a person's language "tend[s] to lower the plaintiff 'in the esteem of any substantial and respectable group, even though it may be quite a small minority.'" Thomson, 119 N.H. at 373 (quoting Prosser on Torts § 111 (4th ed. 1971)).

[8] Citing United States v. Alvarez, 567 U.S. 709, 736 (2012) (Breyer, J., concurring in the judgment), Frese points out that a mens rea requirement does not eliminate chilling concerns because "a speaker might still be worried about being prosecuted for a

- 17 -

Moreover, in order for a statute to give fair notice, it need not map out what is prohibited with "meticulous specificity." Grayned, 408 U.S. at 110 (upholding statute that prohibited the "making of any noise or diversion which disturbs or tends to disturb the peace or good order of [a] school session or class thereof"). It must only "delineate[] its reach in words of common understanding." Id. at 112 (quoting Cameron v. Johnson, 390 U.S. 611, 616 (1968)). Thus, while there is indeed some "breadth" and "flexibility" inherent in the scope of the statute, id. (quoting Esteban v. Cent. Mo. State Coll., 415 F.2d 1077, 1088 (8th Cir. 1969) (Blackmun, J.)), none of Frese's arguments persuade us that a person of average intelligence would have to "to guess" at section 644:11's meaning or the scope of the conduct it prohibits, Councilman, 418 F.3d at 84.

---

careless false statement, even if he does not have the intent required to render him liable." Alvarez did not involve a vagueness challenge, but there is some force to the point. Even if, however, the mens rea requirement standing alone might be insufficient to provide constitutionally adequate notice, it nevertheless does assist in ameliorating notice concerns here.

Similarly, citing Smith, 415 U.S. at 580, and Ashton, 384 U.S. at 200, Frese argues that a mens rea requirement cannot cure an inherently vague statute. Again, while this may be true, our analysis does not rely solely on section 644:11's mens rea component, and we have no trouble finding that the knowledge requirement -- considered in combination with the other factors discussed -- helps to limit vagueness concerns. See United States v. Nieves-Castano, 480 F.3d 597, 603 (1st Cir. 2007) (explaining that the statute's "scienter requirement ameliorates any vagueness concerns" (citing Hill, 530 U.S. at 732)).

- 18 -

### 3. "Hybrid" Vagueness Claim

Having addressed Frese's facial claims, we return briefly to what he characterizes as his "hybrid" vagueness claim. Frese asserts that section 644:11 "is unconstitutionally vague, both on its face and as applied in the context of New Hampshire's system for prosecuting [c]lass B misdemeanors." (Emphasis added). Frese characterizes this second claim as a "hybrid vagueness claim": "it is 'facial' in the sense that it is not limited to Frese's particular case, but it is 'as applied' in the sense that it does not seek to strike [section 644:11] outside the context of New Hampshire's particular misdemeanor process." The district court dismissed Frese's "hybrid" claim for the same reasons that it dismissed his facial claim.

As we discussed above, the New Hampshire statute is not unconstitutionally vague, because it gives meaningful enforcement guidelines and adequate notice. Nor does consideration of the New Hampshire prosecution context alter that conclusion -- regardless of the enforcement setting, the statute is not standardless and provides adequate guidelines for enforcement. See supra note 5. His hybrid claim therefore falls with his facial claim.

### III.

Assuming Frese's 2018 prosecution to have been brought without reasonable cause to believe that Frese knew that his speech had been false, then it was certainly wrongful, as implied by its

- 19 -

dismissal.  But that wrong had little, if anything, to do with what Frese claims is the statute's vagueness.  Certainly "knowing" an assertion to be false is not a vague element.  Nor, for the foregoing reasons, do we think that a reasonable person has much difficulty in ascertaining whether speech subjects a living person to public hatred, contempt, or ridicule and what a "professional or social group" is in this context.  Accordingly, the district court's judgment is **affirmed**.


**-Concurring Opinion Follows-**

**THOMPSON, Circuit Judge, concurring**. I agree with my colleagues that the precedent by which we are bound, see Garrison v. Louisiana, 379 U.S. 64, 68-70 (1964),[9] and the procedural posture in which this appeal arises oblige us to reach the above-reasoned conclusions. I take this opportunity, however, to shine a light on sweeping concerns and important questions this case showcases, but upon which its resolution does not now depend. Each of these concerns and questions, as I'll explain, stem from this overarching query: Can the continued existence of speech-chilling criminal defamation laws be reconciled with the democratic ideals of the First Amendment?

Ours is a country that touts a "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." New York Times Co. v. Sullivan, 376 U.S. 254, 270 (1964). That commitment may well be profound; but it is not the whole story. And lately, one needn't look far for examples of speech curtailed or, by contrast, speech that seems to be wholly divorced from the truth but goes unaddressed by the law. When, as has been the case in this country of late, the truth often seems up for grabs and objectively accurate facts are tossed aside in favor of alternative versions that suit a given narrative, drawing the line between truths and

---

[9] As my colleagues observe, and as Frese concedes, only the Supreme Court can overrule this precedent.

lies -- and malicious lies at that -- is exceptionally tricky. But also exceptionally important. And yet, increasingly, whether and where that line should be drawn as to some speech or other speech seems to depend on who's holding the pen. The significance of all this skyrockets when criminalizing this speech is on the table.

It's at the intersection of history, present day, fact, and fiction (and everything in between) that today's case arises.

As we know, this is a case about New Hampshire's criminal defamation statute, which explains that "[a] person is guilty of a class B misdemeanor if he purposely communicates to any person, orally or in writing, any information which he knows to be false and knows will tend to expose any other living person to public hatred, contempt or ridicule." N.H. Rev. Stat. § 644:11(I).

The troubling seditious-criminal-libel historical context that underpins a law like this one is well known to First Amendment scholars, advocates, and jurists -- and perhaps most deeply felt by those who've had brushes with it. See Garrison, 379 U.S. at 68-70; id. at 79-80 (Black, J., concurring); id. at 80-83 (Douglas, J., concurring); New York Times Co., 376 U.S. at 296-97 (Black, J., concurring); Beauharnais v. Illinois, 343 U.S. 250, 287 (1952) (Jackson, J., dissenting); Abrams v. United States, 250 U.S. 616, 630-31 (1919) (Holmes, J., dissenting) (joined by

- 22 -

Brandeis, J.).[10]  I will not explicate the ins and outs of that history here -- and there is a great deal of important history to digest.  For today's purposes, it suffices to say these laws have their genesis in undemocratic systems that criminalized any speech criticizing public officials.  True, that is not today's American system per se.  But like it or not, that is where our system's roots lie, and even in view of the rightly heightened standards we deploy when reviewing laws that restrict speech, see Nat'l Org. for Marriage v. McKee, 649 F.3d 34, 62 (1st Cir. 2011), abrogated on other grounds by Ams. for Prosperity Found. v. Bonta, 141 S. Ct. 2373 (2021), it is remarkable that we are still confronting laws criminalizing speech at all.

Perhaps the persistence of these laws owes to society-at-large's unawareness of or ambivalence to them.  It's possible many believe criminal defamation is basically off the books; Garrison can be read to have been aimed at accomplishing as much, at least from a federal standpoint, in that it nixed as unconstitutional civil and criminal penalties for truthful statements about public officials, leaving room to sanction only those statements made with actual malice (knowledge of falsity or reckless disregard for the truth).  See 379 U.S. at 74.  But

_____

[10] I urge the curious reader to consult these important cases and the sources upon which they rely.

persist they do, with many states retaining their criminal defamation laws.[11]

And indeed, this is remarkable. Particularly so given the current political climate in this country, with "truth" at a premium. It seems to me that if these laws were robustly enforced, dockets in these states would be positively teeming with prosecutions. That's not what happens. Why is that? Probably because there is no readily discernible boundary between what gossip or loose talk amounts to being criminal and that which does not. Instead, the boundary emerges case by case, lying solely in the eye of the charge-bringing beholder -- or the ego of the person offended or called out by the speech. And this is troubling because it underscores the simple truth that a criminal defamation law can be wielded, weaponized by a person who disagrees with whatever speech has been uttered.[12]

---

[11] See, e.g., Idaho Code §§ 18-4801--4809 (2021); Kan. Stat. Ann. § 21-6103 (2021); Mich. Comp. Laws Ann. § 750.370 (2021); Minn. Stat. Ann. § 609.765 (2021); N.H. Rev. Stat. Ann. § 644:11 (2021); N.C. Gen. Stat. Ann. §§ 14-47, 15-168 (2020); N.D. Cent. Code Ann. § 12.1-15-01 (2021); Okla. Stat. Ann. tit. 21, §§ 771-774, 776-778 (2021); Utah Code Ann.§ 76-9-404 (2021); Va. Code Ann. § 18.2-417 (2021); Wis. Stat. Ann. § 942.01 (2021).

[12] I am mindful that not all criminal defamation prosecutions will be successful, and yes, as my colleagues note, supra note 1, malicious prosecution might in some instances exist as a means to pursue recourse for wrongful prosecution. But the fact remains that a great deal of damage could have already been done to the person targeted by an unsuccessful (or worse, malicious) prosecution, particularly depending on what exactly was said and

To those who might disagree, it strikes me as out of touch with reality to suggest these laws are not being selectively harnessed or that these laws aren't particularly susceptible to such use and abuse. See, e.g., Garrison, 379 U.S. at 80-83 (Douglas, J., concurring) (warning of the dangers posed by criminal defamation laws and those laws acting as "instrument[s] of destruction" for free expression); Gottschalk v. State, 575 P.2d 289, 292 (Alaska 1978) ("It has become clear that the real interest being protected by criminal defamation statutes is personal reputation. Whether that purpose justifies use of the criminal law has been questioned."). And by virtue of their very existence, criminal defamation laws deter and chill speech -- indeed, their existence represents a looming threat of criminal prosecution, which of course will cause many to think twice before speaking out. This is all the more so when, as in New Hampshire, a plea deal or successful criminal defamation prosecution would show up on a background check (and remember, criminal defamation defendants have no right to trial by jury and don't get court-appointed counsel). But "[f]ining [people] or sending them to jail for criticizing public officials not only jeopardizes the free, open public discussion which our Constitution guarantees,

---

done in the course of that prosecution -- that bell, as they say, cannot be unrung.

but can wholly stifle it." Garrison, 379 U.S. at 80 (Black, J., concurring).

It is not lost on me that proponents of criminal defamation laws see utility in having them as an alternative to civil suits to be deployed when, for example, an alleged defamer might be what we refer to as "judgment-proof," i.e., even if a favorable verdict resulted from a civil defamation suit, the defamer wouldn't have the cash available to cover any damages that were assessed. This assumes money damages are the best relief for a victim of defamation, and I cannot abide that premise. Does it not also invite criminal prosecution of people with less means? And critically, having a criminal defamation route enables an end-run around the important constitutional restrictions imposed in civil defamation cases. And I haven't spied any requirement that, to bring a criminal prosecution, one must demonstrate the criminal charge is being pursued because a civil suit just wouldn't cut it for some legitimate reason or another. This brings me back to the reality that criminal defamation laws are all too easily wielded as a silencing threat of punishment for speech.

By my lights, criminal defamation laws -- even the ones that require knowledge of the falsity of the speech -- simply cannot be reconciled with our democratic ideals of robust debate and uninhibited free speech. See id. at 79-80 (Black, J., concurring) ("[T]he Court is mistaken if it thinks that requiring

proof that statements were 'malicious' or 'defamatory' will really create any substantial hurdle to block public officials from punishing those who criticize the way they conduct their office. Indeed, 'malicious,' 'seditious,' and other such evil-sounding words often have been invoked to punish people for expressing their views on public affairs.").[13]  And so I echo the concern voiced by Justice Douglas in Garrison, a concern as valid today as it was nearly sixty years ago:  "It is disquieting to know that one of [seditious libel's] instruments of destruction is abroad in the land today."  379 U.S. at 80-83 (Douglas, J., concurring).

---

[13] Without touching on criminal defamation laws specifically, the Court in United States v. Alvarez, striking down part of the Stolen Valor Act, generally pointed to sweeping dangers posed by criminal restrictions on speech regarding matters of public concern. See 567 U.S. 709, 723 (2012) ("Permitting the government to decree this speech to be a criminal offense, whether shouted from the rooftops or made in a barely audible whisper, would endorse government authority to compile a list of subjects about which false statements are punishable.  That governmental power has no clear limiting principle.  Our constitutional tradition stands against the idea that we need Oceania's Ministry of Truth."); id. at 736-37 (Breyer, J., concurring) (joined by Kagan, J.) (".  .  . [T]here remains a risk of chilling that is not completely eliminated by *mens rea* requirements; a speaker might still be worried about being *prosecuted* for a careless false statement, even if he does not have the intent required to render him liable.  And so the prohibition may be applied where it should not be applied, for example, to bar stool braggadocio or, in the political arena, subtly but selectively to speakers that the Government does not like.").